# Exhibit 13

# CERTIFIED TRANSLATION

Extracts from: "*Indledning til Tingsretten* – tredjemandskonflikter vedrørende løsøre" (*Introduction to property law* – third party conflicts concerning goods)

Edition: 2
Published by: Karnov Group Denmark A/S
Year of publication: 2009
ISBN: 978-87-619-2306-6
Author: Peter Mortensen

Page 61-63

1. Proprietary rights as a right
   *1.1.   **Absolute proprietary rights***
In everyday speech the concept of "proprietary rights" is often associated with being the owner of an asset. If one thinks more closely about what being an asset owner means, one will probably reach the conclusion that the person, who owns an asset, has certain opportunities to utilize this of asset, that another person – who is not the asset owner – does not have. Expressed more legally, proprietary rights are rights, that give the entitled person (the asset owner) exclusive rights to dispose over the asset that the proprietary right relates to. It is hardly possible to exhaustively state all the remedies that characterize a proprietary right. Instead, there must be pointed out attributes, that characterize a proprietary right. However, not all characteristics mentioned below need to be present for a property right to exist. See below in U 1967.22 H about the Icelandic manuscripts, which is an example that ownership may exsist if the owner's rights are (strongly) limited.

Full ownership is characterized by the fact that the owner in principle has complete control over the specific asset to which the ownership relates. The disposition applies in all respects, including by factual dispositions, by legal dispositions – including establishing the asset as a basis for credit – and by mortis causa– i.e., by inheritance. Yet these rights may – and will in practice to some extent – be limited by, or in accordance with law (e.g., by expropriation), general legal principles (consideration of the proprietary rights of others, law relating to adjoining properties and the exercise of emergency rights by others) and/or the owners own voluntary abandonment of rights (by agreement etc.) or by the restrictions of previous owners (settlement) – i.e., by establishing limited rights. These limitations will be addressed below in paragraph 1.2. on limited rights arising from the owner's voluntary abandonment of rights, and in paragraph 1.3 on limitations arising from law, general law principles, or restraint. As a result of these limitations, proprietary rights can only be defined negatively as powers to prevail in any respect with the restrictions that follow from law, general legal principles, agreements, etc.

Disregarding these possible limitations, full ownership implies, in principle, unrestricted authority to dispose over the asset concerned by the proprietary right, in all respects both alive as well and mortis causa. The owner can e.g., exercise physical control over the asset by using the property (e.g., by driving

a car or living in a property), by changing it (e.g., rebuilding or painting a car) or by destroying the property (and thereby voluntarily abandoning its proprietary rights). The owner can also legally dispose of the property, e.g., by renting, mortgaging, or selling to someone else (renter, mortgagee, buyer etc.).

Finally, the owner can decide what to do with the property when the owner dies (mortis causa) – e.g. by will determine that a particular person shall inherit the owner's car.

Another significant characteristic of the absolute ownership is that it expands automatically if previous limitations cease. If the owner of a car e.g. rents this to a person, who drives the car, the owner of the car will be restricted in his rights to the car, for instance by not being able to drive the car simultaneously with the renter (limitation of the factual rights). If the rental agreement is terminated, the renter's right to drive the car is also terminated. The right to drive the car thereby returns to the owner, whose ownership is thus again extended to include driving the car etc. This way an asset owner can in principle regain all rights, that are attached to an absolute ownership. Proprietary rights can popularly be compared to a rubber ball. When the proprietary right is restricted, the rubber ball gets compressed. When the limitation ends the pressure relieves from the rubber ball, which inflates again.

Proprietary rights do hereby not fundamentally differ from limited rights (cf. below in paragraph 1.2.). The rights arising from a limited right, may also be restricted – for example a tenant can (with the consent of the owner) sublet the car to a third person. When the limitation (the sublease agreement) ceases, the tenant regains his original rights. Limited rights can therefore also be said to have the elasticity of a rubber ball. However, the tenant can not regain more rights than the lease agreement gives him. Thus, the tenant will never be able to obtain the same rights as the owner (unless the owner sells the property to the tenant). Thus, limited rights are also extended automatically, but never to a full ownership without being transferred.

Limited rights can be said to be positively determined by the content and scope, which can be determined by interpretation of the transfer agreement, while a full ownership is negatively determined by the limitations connected to the right. A proprietary right can exist even if the owner's rights are limited to a large extent by agreements, legislation etc. Theoretically, therefore doubts may arise as to whether a specific right is an absolute proprietary right which has merely been significantly restricted, or whether the right is an (extensive) limited right (a derived right).

In practice, however, there are rarely delimitation difficulties, as an assessment of how the right arose (transferred) – e.g., interpretation of a transfer agreement – as well as of whether its characteristic remedies correspond with the typical derived rights (right of use, easement, etc.), will often be sufficient to determine which right is in question.

Page 83:

## 2.2.2. Derivative (indirect) acquisition

Derivative – or indirect – acquisition refers to an acquisition of ownership or limited rights, that occurs through the transfer of the right from a former beneficiary. Fundamentally, derivative acquisition can

take place by way transfer, debt enforcement, and by inheritance. Today, derivative acquisition is the most common form of acquisition, as the area of original acquisition, as mentioned, is limited, and extinctive acquisition, c.f. below, generally only occurs when one party acts negligently and builds upon one or more derivative acquisitions. Transfer means a voluntary promise, which involves transferring a certain property right from the promisor (transferor) to another (acquirer). By the words "certain property right" is meant the transfer of e.g. ownership (purchase), right of use (e.g., rent), or right to claim (e.g., promissory note) to a segregated property (species). On the other hand, if the promise relates to a non-specified service – e.g., delivery of a batch of a specific product (genus) or payment of a sum of money – this is not a transfer. The promise creates a claim on a benefit (the shipment or the sum of money), but it does not relate to any specific property (real estate, chattel, promissory notes, etc.) after which the promise cannot be said to transfer the right to a property to the promisee. If the promisor does not fulfil his promise, the promisee may not demand that certain goods be handed over, but can only in general (e.g. by outlay) seek fulfilment in the promisor's assets. Only when a binding segregation of the benefit is made – e.g., separation and labeling of specific goods to fulfill the promise – the right to the separated goods is transferred to the transferee. About binding segregation, se Chapter V,2.2.


Transfer can either be limited, of ownership, or as security. By transfer of ownership, all rights are transferred to the transferee. This is also expressed thereby that ownership is transferred. Examples of transfer of ownership are purchase, exchange, and gifts. By a limited transfer, only some of the transferor's rights are left to the transferee. This is the case with the transfer of limited rights, such as tenancy and easement rights, c.f. section 1.2.2. above. A particular variant of the limited transfers is transfer for security, where the transfer is intended to ensure that the transferor pays a benefit to the transferee. Transfer to security is also referred to as a pledge and may exist as a hand pledge or subpledge, c.f. in more detail above section 1.2.2.4. See also section 2.2.5. on retention of title, and section 1.2.2.6. on the right of retention.


Page 86:

For the same reason assignees are sometimes also referred to as revenue acquirers. However, it is not necessary that the agreement has any effect on the revenue. The extent of the rights, conferred on the assignee by the agreement, is irrelevant to his status as assignee. There is thus an assignee, regardless of whether the agreement establishes a property right or a limited right (rent, mortgage, easement, etc.) It is also irrelevant whether the assignee renders compensation for the right he obtains by the agreement. A recipient of a gift is also an assignee. If a right (remedy) has been transferred at all – and, if so, which one – must be determined by the common rules about entering, interpreting, and completion of agreements.

As stated above in section 1.3.1., a transfer of a proprietary right implies a promise of transfer of the proprietary right. The person who acquires the right under such a transfer is therefore an assignee. Contrarily it can not be concluded with the opposite, thus that only the right holders according to a transfer are assignees. Promises, that transfer the right to a generic benefit, are, as stated above, not transfers, but the recipient of the promise is, in the context of property law, an assignee and is treated

as such, c.f. below, chapter C.2.2. An assignee however only obtains a property right protected against the transferor creditors when a binding segregation has taken place, and thus a transfer has taken place.

At certain points it may give rise to doubts as to whether an acquirer should be perceived as an assignee or not. This is the case regarding the one, that acquires a property at a foreclosure auction. Regarding a foreclosure auction of chattels, it is assumed that the foreclosure buyer is not an assignee. This harmonizes with the fact that the debtor (defendant in enforcement proceedings) does not by a voluntary dispositive action waive his ownership of the sold chattel. The buyer at a foreclosure auction must instead be equated with a creditor in the sense of property law, c.f. section 2.2., as the foreclosure auction itself is an enforcement action. As far as forced sale of real estate is concerned, it is contrarily presumed that the foreclosure buyer is an assignee within the meaning of the Land Registry Act, namely in relation to The Land Registry Act § 1.


Page 148:

First in time, best in court. The legal owner was the original beneficiary and can therefore be said to be first in time in relation to the later acquirer, B. However, the starting point for solving title conflicts, is in general expressed differently: *The acquirer (B), has no better right than the transferor (A) did*. This means that if A had no right due to the objection that the original rights holder could make, then B in principle has no right against the original rights holder either. *The starting point is thus a vindication rule in favor of the original rights holder*. The main view is that the person who transfers a right to another (A), should not be disadvantaged simply because the transferee (A) transfers the right to a third party (B). Otherwise, A – who e.g., has committed deceit or fraud – could "fix" the objection by simply transferring the right on to B, who may be a good friend of, or related to, A, but does not know about the original rights holder's objection. In the event of a subsequent transfer from B to A, the objection extinguished by B  would not wake up again, unless it can be proved that the transfers from A to B and B to A happened solely to cut off the objection of the original rights holder.


This main view– and thereby an absolute vindication rule – has been implemented in its purest form regarding the transfer of simple promissory notes. From The Danish Debt Instruments Act. § 27 states as follows: "if a simple promissory note is transferred to ownership or mortgage, the transferee does not acquire a better right than the transferor, unless otherwise stated in special legal rules." There are only a few exceptions that follow from special legal rules. The principle in The Danish Debt Instruments Act. § 27 is also assumed to apply to other simple claims and must  be assumed to be the general starting point in all legal disputes.


In certain cases, however, the balancing of the consideration for the original rights holder and the consideration for B must lead to the original rights holder having to bear the risk that an objection has arisen in the transfer to A, with the result that B in these cases can extinguish the original rights holder's objection.

Page 226:

In other words: If there is doubt as to which object(s) B has been transferred to, it is difficult to contend that B has anything other than a general right of claim against A for fulfilment of the agreement – a claim, which A in principle is liable for with all its assets, compare above chapter 11,2.2.2.95. Thus, B's right does not differ from the creditors' rights and there is no basis for placing B differently (better) than the creditors.

Precisely the question of protecting B's property right or limited rights against A's creditors and the balancing of in which cases this protection must be obtained is one of the most controversial in Danish property law, even though the subject has been discussed in literature for more than 100 years, and although a number of judgments have been handed down on the question. The following sections argue for what must be considered to be applicable current Danish law. For pedagogical reasons, however, it must already be stated here – without the argumentation – that B must be considered under applicable law to be protected from A's creditors from the time where a segregation (separation) of the purchased goods, which is binding on A. Compared to other previous representations, which are discussed in more detail below, this description of the legal position differs primarily in that the distinction between species- and gender purchases is not given independent significance, and in that no special significance is placed on whether a performed separation is normal. It is not disputed that those factors have a certain significance for the assessment of B's creditor protection, but it is disputed that it is necessary (or useful) to highlight these as generally decisive for the protection. Contrarily the question of normality may be included in the assessment of whether a transfer can be overturned.

The question of B's protection from A's creditors can arise both in the case of cash purchases, credit purchases, and prepayment purchases (payment in advance) – and otherwise in dispositions other than purchases. However, the conflict is most important in prepayment purchases, as the creditors extinction of B's right to the purchased, requires that B is entitled to have his purchase price repaid by A. However, this claim will rarely be very valuable when A's creditors have had to commence enforcement proceedings. Either A does not have sufficient funds for the repayment or he has even been taken into bankruptcy proceedings.

Side 61-63:

1. Ejendomsret som en rettighed

### *1.1. Fuldstændig ejendomsret*

I daglig tale forbindes begrebet »ejendomsret« ofte med det at være ejer af et formuegode. Tænker man lidt nærmere over, hvad det indebærer at være ejer, når man formentlig hurtigt frem til, at den, der ejer et formuegode, har nogle muligheder for at udnytte dette gode, som en anden person - der ikke er ejer - ikke har. Udtrykt mere juridisk er ejendomsret en rettighed, der giver den berettigede (ejeren) nogle eksklusive beføjelser til at råde over det formuegode, som ejendomsretten angår. Det er næppe muligt udtømmende, positivt at angive alle de beføjelser, som karakteriserer en ejendomsret. I stedet må der peges på nogle typiske karakteristika, som kendetegner en ejendomsret. Det er dog ikke alle de nedennævnte karakteristika, der nødvendigvis

behøver at være til stede, for at der foreligger en ejendomsret. Se nedenfor om U 1967.22 H om de islandske håndskrifter, der er et eksempel på, at ejendomsret kan foreligge, selv om ejerens beføjelser er (stærkt) indskrænkede.

Den fuldstændige ejendomsret er kendetegnet ved, at ejeren i princippet har fuld rådighed over det formuegode, som ejendomsretten angår. Rådigheden gælder i enhver henseende, herunder ved faktiske dispositioner, ved retlige dispositioner - herunder ved at lade formuegodet danne grundlag for kredit - og ved dispositioner mortis causa – dvs. ved arv. Disse beføjelser kan dog – og vil i praksis ofte i et vist omfang – være begrænset ved eller i henhold til lov (f.eks. ekspropriation), almindelige retsgrundsætninger (hensynet til andres ejendomsret, naboret og andres udøvelse af nødret) og/eller ved ejerens egen frivillige afgivelse af sine beføjelser (ved aftale mv.) eller ved tidligere ejeres begrænsninger (båndlæggelse) – dvs. ved stiftelse af begrænsede rettigheder. Disse begrænsninger omtales nærmere nedenfor i afsnit 1.2 om begrænsede rettigheder, som skyldes ejerens frivillige afgivelse af beføjelser, og i afsnit 1.3. om begrænsninger, der følger af lov, almindelige retsgrundsætninger eller båndlæggelse. Som følge af disse begrænsninger kan ejendomsretten kun gensigtmæssigt defineres negativt som beføjelser til at råde i enhver henseende med de indskrænkninger, der følger af lov, almindelige grundsætninger, aftaler m.v.

Ses der bort fra de nævnte mulige begrænsninger, indebærer fuldstændig ejendomsret i princippet ubegrænsede beføjelser til at råde over det formuegode, som ejendomsretten angår, i enhver henseende såvel i levende live som mortis causa. Ejeren kan f.eks. råde faktisk ved at bruge formuegodet (f.eks. køre i en bil eller bo i et hus), ved at ændre dette (f.eks. ombygge eller male en bil) eller ved at destruere formuegodet (og dermed frivilligt opgive sin ejendomsret). Ejeren kan tillige råde retligt over formuegodet, f.eks. ved at udleje, pantsætte eller sælge en vil til en anden (lejer, panthaver, køber etc.). Endeligt kan ejeren bestemme, hvad der skal ske med formuegodet, når ejeren dør (mortis causa) – f.eks. ved testamente bestemme, at en bestemt person skal arve ejerens bil.

Et andet væsentligt karakteristikon ved den fuldstændige ejendomsret er, at den udvider sig automatisk, hvis hidtidige begrænsninger ophører. Hvis ejeren af en bil f.eks. udlejer denne til en person, der kører i bilen, indskrænkes ejerens beføjelser, bl.a. fordi ejeren ikke kan køre i bilen samtidigt med lejeren

(indskrænkning i de faktiske beføjelser). Hvis lejeaftalen bringes til ophør, ophører lejerens beføjelse til at køre i bilen også. Beføjelsen til at køre i bilen går derved tilbage til ejeren, hvis ejendomsret (beføjelser) således igen udvides til at omfatte kørsel i bilen. m.v. På denne måde kan en ejer principielt genvinde samtlige beføjelser, som er knyttet til en fuldstændig ejendomsret. Ejendomsretten kan populært sammenlignes med en gummibold. Når ejendomsretten begrænses, presses gummibolden sammen. Når begrænsningerne ophører, lettes trykket på gummibolden, der retter sig ud igen.

Herved adskiller ejendomsretten sig ikke grundlæggende fra de begrænsede rettigheder (jf. nedenfor afsnit 1.2.). De beføjelser, som følger af en begrænset ret, kan også indskrænkes - f.eks. kan lejeren (med ejerens samtykke) fremleje bilen til en tredje person. Når begrænsningen (fremlejeaftalen) ophører, genvinder lejeren sine oprindelige rettigheder. Begrænsede rettigheder har således også en gummibolds elasticitet. Lejeren kan imidlertid ikke genvinde flere rettigheder, end lejeaftalen giver ham. Lejeren vil således aldrig kunne opnå beføjelser som en ejer (medmindre ejeren sælger formuegodet til lejeren). Begrænsede rettigheder udvides således også automatisk, men aldrig til en fuldstændig ejendomsret, uden at en sådan er overdraget.
Begrænsede rettigheder kan siges at være positivt bestemt ved det indhold og omfang, som kan fastlægges ved fortolkning af overladelsesaftalen, mens en fuldstændig ejendomsret er negativt bestemt ved de begrænsninger, der er gjort i retten. Der kan foreligge en ejendomsret, selv om ejerens beføjelser i meget vidt omfang er begrænset af aftaler, lovgivning m.v. Teoretisk kan der derfor opstå tvivl, om en konkret rettighed er en fuldstændig ejendomsret, der blot i betydelig grad er indskrænket, eller om rettigheden er en (vidtgående) begrænset rettighed (afledt rettighed).

I praksis er der dog sjældent afgrænsningsvanskeligheder, idet en vurdering af, hvordan retten er opstået (overført) - f.eks. fortolkning af en overdragelsesaftale - samt af om dens karakteristiske beføjelser svarer til de typiske afledte rettigheder (brugsret, servitut m.v.), ofte vil være tilstrækkelig til at afgøre, hvilken ret der er tale om.

Side 83:
### 2.2.2. Derivativ (afledt) erhvervelse
Derivativ - eller afledt - erhvervelse betegner en erhvervelse af ejendomsret eller begrænsede rettigheder, som sker ved overførelse af retten fra en tidligere berettiget. Grundlæggende kan afledt erhvervelse ske ved overdragelse, kreditorforfølgning og ved arv. I dag er afledt erhvervelse den mest almindelige erhvervelsesform, idet området for oprindelig erhvervelse som nævnt er begrænset, og idet de ekstinktive erhvervelser, jf. nedenfor, som hovedregel kun indtræder, når en part udviser forsømmelighed og bygger på en eller flere afledte erhvervelser. Ved overdragelse forstås et frivilligt løfte, som går ud på at overføre en bestemt formuerettighed fra løftegiveren (overdrageren) til en anden (erhververen). Ved ordene »bestemt formuerettighed« menes overdragelse af f.eks. ejendomsret (køb), brugsret (f.eks. leje), fordringsret (f.eks. gældsbreve) til et individualiseret formuegode (species). Går løftet derimod ud på en ubestemt ydelse - f.eks. levering af et parti af en artsbestemt vare (genus) eller betaling af et pengebeløb - er der ikke tale om en overdragelse. Løftet skaber en fordring på en ydelse (varepartiet eller pengebeløbet), men det vedrører ikke noget bestemt formuegode (fast ejendom, løsøre, gældsbreve m.v.), hvorfor løftet heller ikke kan siges at overføre retten til et formuegode til løftemodtageren. Hvis løftegiver ikke opfylder sit løfte, kan løftemodtageren ikke kræve bestemte varer udleveret, men kan alene generelt

(f.eks. ved udlæg) søge fyldestgørelse i løftegiverens aktiver. Først når der sker en bindende individualisering af ydelsen - f.eks. udskillelse og mærkning af bestemte varer til opfyldelse af løftet - overdrages retten til de udskilte varer til erhververen. Om bindende individualisering, se kapitel V,2.2.

Overdragelse kan enten ske begrænset, til eje eller til sikkerhed. Ved en overdragelse til eje, overdrages alle beføjelser til erhververen. Dette udtrykkes også således, at ejendomsretten overdrages. Eksempler på overdragelse til eje er køb, bytte og gaver. Ved en begrænset overdragelse overlades alene nogle af overdragerens beføjelser til erhververen. Dette er tilfældet ved overdragelse af begrænsede rettigheder som f.eks. leje- og servitutrettigheder, jf. ovenfor afsnit 1.2.2. En særlig variant af de begrænsede overdragelser er overdragelse til sikkerhed, hvor overdragelsen har til formål at sikre, at overdrageren erlægger en ydelse til erhververen. Overdragelse til sikkerhed betegnes også pantsætning og kan foreligge som håndpantsætning eller underpantsætning, jf. nærmere ovenfor afsnit 1.2.2.4. Se endvidere afsnit 2.2.5. om ejendomsforbehold og afsnit 1.2.2.6. om tilbageholdsret.


Side 86:
Af samme grund kaldes aftaleerhververe til tider også for omsætningserhververe. Dog er det ikke nødvendigt, at aftalen har nogen betydning for omsætningen. Omfanget af de beføjelser, som aftaleerhververen opnår ved aftalen, er uden betydning for hans status som aftaleerhverver. Der er således tale om en aftaleerhverver, uanset om aftalen stifter en ejendomsret eller en begrænset ret (leje, pant, servitutret m.v). Det er ligeledes uden betydning, om aftaleerhververen yder vederlag for den ret, som han opnår ved aftalen. En modtager af en gave er også aftaleerhverver. Om der overhovedet er overført en ret (beføjelser) – og i givet fald hvilken – må afgøres efter de almindelige regler om indgåelse, fortolkning og udfyldning af aftaler.
Som anført ovenfor i afsnit 1.3.1., indebærer en overdragelse af en formueret(tighed et løfte om overførelse af formueret(tigheden. Den, der opnår ret i henhold til en sådan overdragelse, er derfor aftaleerhverver. Der kan derimod ikke sluttes omvendt, således at kun rettighedshavere i henhold til en overdragelse er aftaleerhververe. Løfter, der overfører ret til en genusydelse, er som anført ovenfor ikke overdragelser, men løftemodtageren er i tingsretlig sammenhæng aftaleerhverver og behandles som sådan, jf. nedenfor kapitel V.2.2. Aftaleerhververen opnår imidlertid først en tingligt beskyttet ret mod overdragerend kreditorer, når der er sket en bindende individualisering og dermed sket en overdragelse.

På enkelte punkter kan det give anledning til tvivl, om en erhverver skal opfattes som aftaleerhverver eller ej. Dette er tilfældet for så vidt angår den, der erhverver et formuegode på en tvangsauktion. For så vidt angår tvangsauktion over løsøre antages det, at tvangsauktionskøberen ikke er aftaleerhverver. Dette harmonerer med, at skyldneren (rekvisitus) ikke ved en frivillig dispositiv akt giver afkald på sin ejendomsret til det bortsolgte løsøre. Tvangsauktionskøberen må i stedet sidestilles med en kreditor i tingsretlig forstand, jf. afsnit 2.2, idet selve tvangsauktionsbehandlingen er et kreditorforfølgningsskridt. For så vidt angår tvangsauktion over fast ejendom er der derimod antaget, at tvangsauktionskøberen er en aftaleerhverver i tinglysningslovens forstand, navnlig i relation til TL § 1.

Side 148:

Først i tid, bedst i ret. Hjemmelsmanden var den oprindeligt berettigede og kan således siges at være først i tid i forhold til den senere erhverver, B. I almindelighed udtrykkes udgangspunktet for løsningen af hjemmelskonflikter imidlertid på en anden måde: *Erhververen (B) har som udgangspunkt ikke bedre ret end overdrageren (A) havde.* Dette betyder, at hvis A ikke havde nogen ret på grund af den indsigelse, som hjemmelsmanden kunne gøre gældende, så har B som udgangspunkt heller ikke nogen ret over for hjemmelsmanden. *Udgangspunktet er således en vindikationsregel til fordel for hjemmelsmanden.* Grundsynspunktet er, at den, der overdrager en ret til en anden (A), ikke skal stilles ringere, blot fordi erhververen (A) videreoverdrager retten til tredjemand (B). I modsat fald kunne A - der f.eks. har udøvet svig eller falsk - »reparere« indsigelsen herom ved blot at videreoverdrage retten til B, der måske er en god ven eller i nær familie med A, men som ikke kender til hjemmelsmandens indsigelse. Ved en senere tilbageoverdragelse fra B til A ville den af B ekstingverede indsigelse ikke vågne op igen, medmindre at det kan bevises, at overdragelserne fra A til B og fra B til A netop er sket for at afskære hjemmelsmandens indsigelse.

Dette grundsynspunkt - og dermed en absolut vindikationsregel – er gennemført i dens mest rene form for så vidt angår overdragelse af *simple gældsbreve.* Af gbl. § 27 fremgår det således: »Overdrages et simpelt gældsbrev til eje eller pant, får erhververen ikke bedre ret end overdrageren, medmindre andet følger af særlige retsregler.« Der er kun ganske få undtagelser, som følger af særlige retsregler. Princippet i gbl. § 27 antages også at gælde for andre *simple fordringer,* og det må antages at være det almindelige udgangspunkt i alle hjemmelskonflikter.

I visse tilfælde må afvejningen af hensynet til hjemmelsmanden og hensynet til B imidlertid føre til, at hjemmelsmanden må bære risikoen for, at der er opstået en indsigelse ved overdragelsen til A med det resultat, at B i disse tilfælde kan ekstingvere hjemmelsmandens indsigelse.

Side 226:
Eller med andre ord: Hvis der er tvivl om, hvilke(n) genstand(e), som B har fået overdraget, er det vanskeligt at hævde, at B har andet end en generel fordringsret mod A på opfyldelse af aftalen - en fordring, som A principielt hæfter for med hele sin formue, sammenlign ovenfor kapitel 11,2.2.2.95 Dermed adskiller B's ret sig ikke fra kreditorernes ret, og der er ikke grundlag for at stille B anderledes (bedre) end kreditorerne.

Netop spørgsmålet om beskyttelse af B's ejendomsret eller begrænsede rettigheder over for A's kreditorer og afvejningen af, i hvilke tilfælde denne beskyttelse skal opnås, hører til et af de mest omtvistede i dansk tingsret, selv om emnet har været diskuteret i litteraturen i de seneste mere end l00 år, og selv om der er afsagt en række domme om spørgsmålet. I de følgende afsnit argumenteres for, hvad der må anses for at være gældende dansk ret i dag. Af pædagogiske grunde skal det dog allerede her - uden argumentationen - anføres, at B efter gældende ret må anses for at være beskyttet over for A's kreditorer fra det tidspunkt, hvor der er foretaget en individualisering (udskillelse) af det købte, som er bindende for A. I forhold til andre, tidligere fremstillinger, der omtales nærmere nedenfor, adskiller denne beskrivelse af retsstillingen sig primært ved, at sondringen mellem species- og genuskøb ikke tillægges selvstændig betydning, samt ved at der ikke lægges særskilt vægt på, om en foretagen udskillelse er

normal. Det bestrides ikke, at de nævnte momenter har en vis betydning for vurderingen af B's kreditorbeskyttelse, men det bestrides, at det er nødvendigt (eller hensigtsmæssigt) at fremhæve disse som generelt afgørende for beskyttelsen. Derimod kan spørgsmålet om normalitet indgå ved vurderingen af, om en overdragelse kan omstødes.

Spørgsmålet om B's beskyttelse over for A's kreditorer kan opstå både ved kontantkøb, kreditkøb og ved forudbetalingskøb (prænumerationskøb) - og i øvrigt ved andre dispositioner end køb. Konflikten har dog størst betydning ved forudbetalingskøb, idet kreditorernes ekstinktion af B's ret til det købte, indebærer, at B har krav på at få sin købesum tilbagebetalt af A. Dette krav vil imidlertid sjældent være meget værd, når A's kreditorer har måttet skride til kreditorforfølgning. Enten har A ikke tilstrækkelige midler til tilbagebetalingen eller også er han ligefrem taget under konkursbehandling.

"I, the undersigned, Julie Marie Christiansen, certify that I am fluent in both the English and Danish languages and that the preceding text in the English language is to the best of my knowledge and belief a true and faithful translation of the attached extract from the Danish textbook Indledning til Tingsretten, ISBN 978-87-619-2306-6 in the Danish language."

Copenhagen, 6 June 2022

Julie Marie Christiansen
Assistant Attorney, LLM