# Exhibit 47, Part 2 of 5

On January 09, 2019, the Court rejected the pension plans' motion to dismiss in its entirety (**Appendix AF**). The court's order states, among other things (p. 4), that

> *"If appellant can prove that the defendants never in fact owned the relevant Danish stocks – and the Court is obliged to accept their allegations as true for present purposes – the revenue rule would not apply because the substance of the claims would be for garden variety commercial fraud. Accordingly, the motion to dismiss is denied."*

In this respect, the Court emphasizes, among other things, that in its summons the Danish Tax Agency has alleged that there is fraud *("commercial fraud")* (order, p. 11 et seq.) and that a ruling on the case does not require an interpretation of the concept of "beneficial ownership" in Danish tax law. The Danish Tax Agency has thus claimed – without distinguishing between actual and beneficial ownership  –  that the pension plans have not owned the shares, and the pension plans have not provided any evidence to the contrary (order, p. 16).

### 4.1.3    Settlement: repayment of DKK 10 million and DKK 1.6 billion respectively.

The Danish Tax Agency has reached two settlements with a total of 63 US pension plans as well as related individuals and companies:

In the fall of 2018, the Danish Tax Agency settled with 2 US pension plans. The two pension plans had previously filed complaints with the Danish Tax Agency. When the cases were settled in autumn 2018, the complaints were withdrawn. As a result of the settlements, the two pension plans repaid the refunded amounts, see the press release from the Ministry of Taxation from the November 01, 2018 (**Appendix AG**) and the press release dated May 29, 2019 (**Appendix AH**).

In May 2019, the Danish Tax Agency reached a new settlement agreement. The new settlement agreement was reached with 61 US pension plans and a number of related persons and companies. The 61 pension plans had received approximately DKK 2.9 billion in the period 2012–2015. Of this, the pension plans themselves had received approximately DKK 1.6 billion. The settlement was that the pension plans and the persons and companies associated with them would repay approximately DKK 1.6 billion. The remainder of the amount is still being traced by the Danish Tax Agency to other responsible parties (Appendix AH).

So far, 63 US pension plans have settled the case, covering more than a fifth of the total suspected fraud.

### 5.    Data analysis conducted by the Danish Tax Agency

The Danish Tax Agency has reviewed the refund requests submitted and compared these with the Danish C20 companies' distributions, share capital, etc. On this basis, the Danish Tax Agency has carried out an overall analysis of whether the refund requests *are* correct.

The analysis resulted in two sub-conclusions, which are discussed in more detail below:

> Too much has been refunded in relation to what is withheld
> In some cases, _more than_ the amount of dividend tax withheld has been refunded. Theis proves that (part of) the refund requests are fraudulent, as the refund cannot exceed the amount withheld.

> The refund requests are based on unlikely large investments in and ownership of Danish companies
> It is *quite unlikely* that very significant shares of Danish C20 companies would be owned by unknown pension plans etc., which often have sole ownership, and which have at most a very modest capital base.

The partial conclusions of the analysis show that there has been significant fraud.

### 5.1.1    Basis for the Danish Tax Agency's analysis

The Danish Tax Agency has analyzed a number of distributions from selected Danish companies where the pension plans etc. have subsequently applied for a refund of alleged withheld dividend tax. The Danish Tax Agency's analysis has focused on the distributions where the pension plans etc. have received the largest proceeds and where SØIK has obtained material from VP Securities. The analysis has thus covered approximately DKK 12.4 billion out of the total fraud of DKK 12.7 billion.

#### 5.1.1.1    The legal basis

When companies distribute dividends, they are generally required to withhold 27% dividend tax on all dividends. However, withholding may be applied, for example, at 0% or 15% instead, depending on the circumstances and information about the recipient of the dividend, cf. sections 65-67 A of the Withholding Tax Act.

Withholding at rates other than 27 % indicates that the taxpayer is covered by an exemption, see for example Section 65(11) of the Withholding Tax Act and Section 31(1)(2) of the Withholding Tax Order. In such cases, no (legitimate) claim for refund of dividend tax could be made under double taxation agreements, as the recipient of the dividend would not meet the requirements of the exemption clause if he or she were a foreign tax resident.  It is therefore only when 27% dividend tax is included that a refund can be claimed.

In addition, the requests must be supported by a double taxation agreement. It is therefore a requirement that the applicant is not resident in Denmark, in which case the person would not be covered by a double taxation agreement.

A refund of dividend tax can thus only (legitimately) be claimed if the withholding tax has been withheld at the rate of 27% from a (for taxation purposes) foreigner.

#### 5.1.1.2    The factual information

For Danish listed companies, VP Securities registers the taxation to be paid to each of the registered owners when dividends are distributed. VP Securities also handles the actual distribution. VP Securities then informs the company of the distributions, among other things so that the company can fulfil its obligation to provide information to the Danish Tax Agency.

Indeed, companies are obliged to declare to the Danish Tax Agency what is distributed in total and what is included in dividend tax at each of the given percentages (among others 15% and 27%). On this basis the Danish Tax Agency is aware of:

> Amount distributed.
> Included dividend tax - both total and broken down by the respective percentages.

The Danish Tax Agency also has information on all refund requests, as these have been sent to the Danish Tax Agency. The information has been recorded in the IT system 35 for applications from the form system.

When the Danish Tax Agency became aware that refund requests for dividend tax might have been fraudulently submitted, the Danish Tax Agency manually made a calculation of the total amount of refund requested for each distribution. In addition, the Danish Tax Agency manually calculated how much the pension plans, etc. had requested to be refunded per distribution. As a result, the Danish Tax Agency is currently aware of:

> Total refund requests for each distribution.
> Refund requests from pension plans, etc. for each distribution.

In addition, the Danish Tax Agency has received additional information from VP Securities, which SØIK has obtained. This information has been extracted directly from VP Securities' records relating to a number of specific distributions. This includes the total number of shares (in each share class) in circulation at the time of the distribution and the name and address of each registered owner at the time of the distribution.

The ownership information registered in VP Securities is not complete. For example, a significant part of the shares of listed companies are registered as owned by banks, which have a common custodial account for their customers (called an omnibus custody account). Here the bank is registered as the owner in VP Securities' records, even though it is a client who actually owns the shareholding. Omnibus custody accounts are registered with the nationality/address of the custodian (typically the bank) – without knowledge of the nationality of the underlying owner. Furthermore, addresses registered in VP Securities may not have been updated when the shareholder moved.

The Danish Tax Agency has used the address information from VP Securities to determine whether the owner (for tax purposes) is a foreigner. Given that a very significant proportion of Danish C20 shares are held in omnibus depositories, the proportion of foreign shareholders *may* be different from what appears in VP Securities' records. Nevertheless, the statement gives an indication of the proportion of shares held by residents of countries other than Denmark.

On the basis of the companies' reports and the data obtained from VP Securities, the Danish Tax Agency has obtained knowledge of:

> Total number of shares held on the dividend date.
> Percentage of shares registered as owned by foreigners at the date of dividend.

Finally, the Danish Tax Agency has collected a range of publicly available information on, among other things, share prices and dividends per share.

### 5.1.2    The result of the analysis
#### 5.1.2.1    Reimbursement is excessive in relation to what is withheld
The Danish Tax Agency has compared the refund requests with the withheld dividend tax for the distributions in the period 2012–2015 from Danish C20 companies where there has been the most extensive fraud with refund requests (Appendix C1). Thus, not all distributions have been included in the analysis, but a sample of selected distributions.

The analysis has shown that across the distributions analyzed, 76.9% of the amount withheld has been paid out as a dividend refund.

Looking at each distribution separately, it appears that in 11 cases *more was refunded than was withheld* (Appendix C1) and that fraud accounted for a very large proportion of refunds. In three cases, just *the pension plans etc. alone* were refunded more than the amount withheld.

When more is refunded than is withheld, it goes without saying that some of the refund requests have been unjustified. There can be no claim to be "refunded" something that has never been withheld.

……

The Danish Tax Agency then carried out an even more in-depth analysis (Appendix C2). As discussed, dividend refunds are only available if dividend tax is withheld at the rate of 27% and the recipient of the dividend is a foreigner (for tax purposes).

The analysis shows that 91.7 % of the dividend included at the rate of 27% has been reimbursed. Taking into account that not all shares with a dividend tax rate of 27% are owned by foreigners, that far from all foreigners are eligible for refund at all and that many foreigners will be eligible for partial refund at most, it is clear that (part of) the refund requests have been unjustified.

This is particularly true for the individual distributions. In 14 cases, **more than the dividend tax** withheld at the **rate of 27%** according to VP Securities' records was **refunded** (Appendix C2). This is not (legally) possible.

Furthermore, in 23 cases, ***more than the dividend tax*** withheld ***from foreigners at the rate of 27%*** according to the registration of VP Securities was ***refunded*** (Appendix C2).

### 5.1.2.2    Refund requests reflect unlikely investments and ownership

The Danish Tax Agency has also compared the information on the number of shares at the time of the dividend with the official share prices on that date (Appendix C3). This made it possible to calculate the total investment of the pension plans, etc. in each C20 company at the time of the dividend.

As can be seen, the total investment for the pension plans, etc. has been around DKK 910 billion during March 2015.

However, given the different distribution dates of the different companies, the investments have not necessarily been simultaneous, even if they are within the same month. As an example, investments made on March 19, 2015, amounted to DKK 445 billion in Novo Nordisk (B) and DKK 13.2 billion in GN Store Nord, for a total of DKK 458.2 billion.

Finally, the Danish Tax Agency has compared the number of shares requested with the total share capital of the companies (Appendix C4). On this basis, it has been calculated what proportion of the total share capital of the companies should have been collectively held by the pension plans, etc. This has been compared with the proportion of the company's shares that have been available for such investments.

As can be seen, the pension plans etc. would have owned, among other things 51.4% of the A.P. Møller shares in 2014, 59.5% of the Novo Nordisk B shares in 2014 and 66.9% of the FL Smidth & Co. shares in 2015.

Overall, it is quite unlikely that shareholders who are unknown on the Danish market would have made such large investments and hold such significant shares. As a result of this, the figures therefore support the view that a large proportion of refund requests must be unjustified.

In particular, in relation to the A.P. Møller shares, it is noted that four known major Danish shareholders together owned 52.82 % of the share capital in 2014 (Appendix D), making it impossible for the pension plans etc. to own 51.4 %.

### 6.        Share purchase: terms of settlement not in line with market

The chart below shows how pension plans represented by the Law Firm Lundgrens – in the 1st wave of complaints – using ED&F Man as custodian, have settled their share trades (Summary Statement, Section 4.5):

| | American | | Kamco LP Profit | | Kamco Investments | | DW Construction | | Linden | | Moira | | Riverside | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Purchase | Sales | Purchase | Sales | Purchase | Sales | Purchase | Sales | Purchase | Sales | Purchase | Sales | Purchase | Sales |
| Coloplast | 5/12·13 (T+4) | – | | | | | | | | | | | | |
| Novozymes | | | | | | | | | | | 25/2·14 (T+3) | 22/5·14 (T+3) | | |
| TDC | 5/3·14 (T+3) 6/3·14 (T+4) 6/3·14 (T+4) | – | 5/3·14 (T+3) 6/3·14 (T+4) 6/3·14 (T+4) | 10/6·14 (T+3) | 6/3·14 (T+4) | 10/6·14 (T+3) | 6/3·14 (T+4) | 10/6·14 (T+3) | 6/3·14 (T+4) | 10/6·14 (T+3) | 6/3·14 (T+4) | 10/6·14 (T+3) | 6/3·14 (T+4) | – |
| Danske Bank | 18/3·14 (T+4) 17/3·14 (T+3) 18/3·14 (T+4) | 10/6·14 (T+3) | 18/3·14 (T+4) 18/3·14 (T+4) 19/3·14 (T+4) 18/3·14 (T+4) | 10/6·14 (T+3) | 18/3·14 (T+4) | 10/6·14 (T+3) | 18/3·14 (T+4) | 10/6·14 T+3 | 18/3·14 (T+4) | 10/6·14 T+ | 18/3·14 (T+4) | 10/6·14 (T+3) | 18/3·14 (T+4) | |
| Novo Nordisk | 20/3·14 (T+4) | 10/6·14 (T+3) | 20/3·14 (T+4) 19/3·14 (T+3) | 10/6·14 (T+3) | 20/3·14 (T+4) | 10/6·14 (T+3) | 20/3·14 (T+4) | 10/6·14 (T+3) | 20/3·14 (T+4) | 0 | 20/3·14 (T+4) | – | 20/3·14 (T+4) | |
| Mærsk·B | 28/3·14 (T+3) | 10/6·14 (T+3) | 31/3·14 (T+4) | 10/6·14 (T+3) | | | 31/3·14 T+4 | 1 10/·14 (T+3) | | | 31/3·14 (T+4) | 10/6·14 (T+3) | | |
| Tryg | 2/4·14 (T+3) | 10/6·14 (T+3) | | | | | | | 3/4·14 (T+4) | – | 3/4·14 (T+4) | 10/6·14 (T+3) | 3/4·14 (T+4) | – |
| D/S Norden | | | | | | | | | 23/4·14 (T+4) | 10/6·14 (T+3) | | | 23/4·14 (T+4) | – |
| Coloplast | | | | | 8/5·14 (T+4) 8/5·14 (T+4) | 10/6·14 (T+3) | 8/5·14 (T+4) 8/5·14 (T+4) | 10/6·14 (T+3) | 8/5·14 (T+4) | 10/6·14 (T+3) | | | 8/5·14 (T+4) | – |
| TDC | 7/8·14 (T+2) | – | 7/8·14 (T+2) | 22/9·16 (T+3) | 7/8·14 (T+2) | 22/9·16 (T+3) | 7/8·14 (T+2) | 22/9·16 (T+1) | | | 7/8·14 (T+2) | 22/9·16 (T+1) | | |
| Chr. Hansen Holding | 27/11·14 (T+2) | – | | | | | | | | | | | | |
| Coloplast | 3/12·14 (T+2) | 10/12·14 (T+2) | | | | | 3/12·14 (T+2) | – | | | 3/12·14 (T+2) | 8/12·14 (T+1) | | |
| Novozymes | 25/2·15 (T+3) | 26/2·15 (T+2) | | | | | | | 23/2·15 (T+2) | – | | | | |
| TDC | | | | | | | | | 4/3·15 (T+2) | 6/3·15 (T+2) | | | 4/3·15 (T+2) | – |
| DSV | | | | | | | | | | | | | | |
| Pandora | | | | | | | | | | | | | 17/3·15 (T+2) | – |
| Danske Bank | | | | | | | | | | | | | 13/3·15 (T+1) | – |
| Novo Nordisk | | | | | | | | | | | | | 13/3·15 (T+2) | |

**The Pension Plan's Summary Submission dated November 15, 2019**

The Pension Plan has made the following statement:

"With reference to the Danish Tax Agency's recommendation dated October 04 and the Danish Tax Agency's comments dated October 18, the appellant hereby responds.

It is noted that the plea in law is upheld.

The reason for the recommendation is essentially that the Danish Tax Agency does not consider that the documentation received by the appellant from ED&F can be given evidential weight in the decision of the case.

It should be noted that ED&F has acted as custodian on behalf of the appellant and that ED&F has been entrusted with the execution of the transactions that the appellant has been able to carry out. It has always been the opinion of the appellant that ED&F has followed the instructions received from the appellant and that these instructions have resulted in the purchases and sales of shares which the appellant has instructed ED&F to carry out.

By its very nature, the appellant is not in a position to say with certainty what happened internally within ED&F in relation to the execution of the transactions. As a result of this, the appellant lacks a basic understanding and insight into the internal affairs of ED&F to be able to express an opinion as to whether the transactions in question, which the appellant has instructed ED&F to carry out, have actually been carried out.

However, the appellant has no objective basis to conclude that ED&F has not acted fairly and correctly and in accordance with applicable law.

Therefore, it is necessary for the appellant to rely on the documents received by the appellant from ED&F.

The appellant is still of the opinion, that these documents correctly state the facts relevant to the case, namely:

– That the appellant had financing for the purchase of the shares in question
– That the appellant purchased the shares in question through ED&F since the appellant received confirmation from ED&F that it had purchased the shares
– That the appellant has paid the purchase price for the shares in question
– That the shares in question have been registered in the appellant's custodial account with ED&F
– That the appellant has received dividends from the dividend-paying company
– That the appellant has had withholding tax withheld on the dividend distribution
– That the appellant subsequently sold the shares in question
– That the appellant has received the sale price for the shares in question

The appellant has provided the usual and proper documentation of the above facts, which documentation has also led the Danish Tax Agency to decide that the Danish Tax Agency would refund the withholding tax withheld that the Danish tax Agency had received from the dividend distributing company in relation to the dividend distributions received by the appellant.

**********

The Danish Tax Agency's recommendation is based on the premise that the documentation received by the appellant from ED&F cannot be relied upon.

As stated above, the appellant has no basis to assume that the documentation received from ED&F is not accurate and a correct expression of the facts.

The appellant has made a note of the content of the Danish Tax Agency's submission from the October 18. It appears from this submission that ED&F had apparently admitted issuing tax vouchers with incorrect content in proceedings brought in England. This is alleged to have occurred in 89 cases and to relate to total reimbursements of approximately DKK 184 million.

The appellant has been refunded 21,060,000 DKK in withholding tax and of these 8,613,000 DKK have been refunded unjustifiably as a result of the allegedly erroneous Tax Vouchers.

The appellant is not aware of the reason why these Tax Vouchers should be wrong. ED&F has stated that the appellant has not been paid dividends to the extent stated and therefore has not had withholding tax withheld.

However, this seems to be in contradiction with the documentation received by the appellant from ED&F.

The appellant is not aware of the history surrounding the alleged error and the Danish Tax Agency has not provided any further evidence that the alleged facts are correct, nor has the Danish Tax Agency explained why it considers these Tax Vouchers to be incorrect.

This leaves the appellant with no way of knowing what has happened at ED&F and what the cause of the alleged errors may be. In this context, the appellant finds it necessary to rely on the documentation which the appellant has received from ED&F on an ongoing basis (the appellant is not a party to the action brought in London and from which the information in question originates) and the appellant must maintain that all the Tax Vouchers received (and the other documents in the case) are of course correct.

It is noted for the record that even if ED&F may have issued erroneous Tax Vouchers to the appellant for an amount of DKK 8,613,000, it can therefore also be concluded that the Tax Vouchers relating to the remaining amount of DKK 12,447,000 which has been paid by the Danish tax Agency to the appellant, must be correct, and this can serve as a basis for the appellant's justified receipt of a refund of withholding tax that has been withheld.

This, according to this argument, it can also be concluded that recovery of a total of DKK 12,447,000 must be correct.

**********

In its submission dated August 12, 2019, the Danish Tax Agency described a transaction with Chr. Hansen shares which, according to the Danish Tax Agency, cannot be taken into account.

This is contested.

According to the appellants opinion, The Danish Tax Agency's view is based on an incorrect understanding of how the shares have been traded. The Danish Tax Agency's conclusion is also incorrect.

The trade with Chr. Hansen shares described by the Danish Tax Agency in its submission dated August 12 is repeated in full in the Danish Tax Agency's submission of October 18. It is not clear what the rationale was for a full repetition of the same circumstances.

With reference to the same supporting documents submitted by the appellant and submitted by the Danish Tax Agency in its submission dated August 12, the appellant hereby reviews the transaction as properly conducted in accordance with the supporting documents submitted. The review will show that the Danish Tax Agency's conclusion is incorrect and that the appellant purchased the shares in question, received dividends thereon and had withholding tax withheld on the same distribution.

Overall, it is the Tax Agency's conclusion that the appellant's recovery on Chr. Hansen shares has not been lawful since they are said to be "borrowed" shares.

However, this is not correct. The appellant did not borrow the shares in question and the Danish Tax Agency's conclusion is thus based on an incorrect understanding of the facts or an incorrect understanding or representation of the documentation provided.

In this context, it is irrelevant how ED&F acquired the shares in question – the only decisive factor is whether the appellant actually acquired them.

The appellant was the legal owner of the shares in question on the date on which the dividend distribution was adopted, as can be seen from the supporting documents submitted, which will be examined below.

However, it must be emphasized that the appellant had no knowledge of how the trades were actually carried out and that the appellant thus had no knowledge of how ED&F acted when the appellant wanted to buy a given share. The following considerations are thus based on the appellant's understanding of the supporting material produced and submitted by the Danish Tax Agency in the case.

On the basis of the supplementary material which has now been submitted – of which the appellant had no knowledge or awareness at the time the transactions were carried out – it is the appellant's understanding that the course of events was as follows:

It appears to be correct that ED&F has borrowed DKK 800,000 of shares from Morgan Stanley, see Appendix Å2.

As the appellant understands the documents that have been submitted, ED&F must have posted them to a custodial account belonging to ED&F.

ED&F has then chosen to purchase the borrowed shares, after which the shares have been transferred internally within ED&F to another custodial account. Legal ownership of the shares then passed to ED&F and ED&F became the legal owner for tax purposes – with the effect that the lender was no longer the owner (either for legal or tax purposes).

ED&F subsequently sold the same shareholding to the appellant with the addition of a processing fee of 0.00125%. This is very much in line with the Tax Agency's description of the facts, see the Tax Agency's submission from August 12, p. 12 at the bottom and p. 13 at the top.

According to this, the appellant has been the legal owner of the share in question.

As can clearly be seen, these are not "borrowed shares." It is a question of the appellant having purchased the shares traded from ED&F. Ownership of the shares has thus been transferred to the appellant.

As a result of this, there are therefore no "borrowed shares."

The appellant has legally purchased and acquired the shares in question, as is clear from the Danish Tax Agency's own documentation in the case.

The financing of the trade can be seen from Appendix Å1 p. 2 under "pending trades." It is therefore not correct when the Danish Tax Agency claims that the appellant did not have the financial means to finance the trade in question."

**Supplementary summary submission from the Danish Tax Agency dated March 31, 2020**

"

**The Danish Tax Appeals Board's case no. 18-0006637 – Leading cases, appellants represented by the Law Firm Lundgrens – Supplement to the Tax Agency's summary submission**

The Danish Tax Agency issued summary statements in four cases on October 18, 2019, with a hearing scheduled for the May 15, 2020. This supplement to the summary pleadings relates to the three leading cases in which ED&F Man has been used as custodian:

| SANSTs ase.no. | Name |
|---|---|
| 18-0005426 | American Investment Group Of New York, L.P. Pension Plan |
| 18-0005414 | Kamco LP Profit Sharing Pension Plan |
| 18-0005308 | Del Mar Asset Management Saving & Retirement Plan |

The submission is complementary to the summary submission, which in each of the cases can be found in section 5.2 and should be read in conjunction with that section.

Since the submission of the summary, the Danish Tax Agency has carried out further investigations into the circumstances of ED&F Man. These investigations give rise to the following additional observations concerning the ED&F Man methodology, which shows that the pension plans' 'shareholdings' have only been an exercise of creative accounting:

1.    **ADDITIONAL COMMENTS ON ED&F MAN'S CREATIVE ACCOUNTING: TDC SHARES**

The Danish Tax Agency reviewed in its Summary submission, Section 5.2, how ED&F Man constructed purchases and SWIFT notifications for the Kamco LP Profit Sharing Pension Plan (SANST case no. 18-0005414) ("Kamco") regarding TDC shares in August 2014 by trading shares back and forth between two of ED&F Man's own accounts.

Moreover, the Danish Tax Agency documented how "evidence" was constructed that Kamco "sold" the shares in the autumn of 2016 after more than two years of "ownership" (a quite unusually long period for this group of cases), while ED&F Man had not held a single TDC share during most of the "ownership period."

Upon further review, the Danish Tax Agency found that the "sale" in September 2016 (Appendix AA1 (Revised), p. 5) appeared to be motivated by an inquiry from the Danish Tax Agency (**Appendix AA10**). The Danish Tax Agency sent a request to ED&F Man to provide materials on August 04, 2016 (Appendix AA10.1). The material was requested for the purpose of an audit of a TDC shareholding in August 2015 for DW Construction Inc Retirement Plan ("DW Construction"), where the Danish Tax Agency later decided to deny the refund request. DW Construction did not appeal the denial, however, they have a pending appeal for revocation of denial decisions (SANST case no. 18-0005398).

On August 16, 2016, ED&F Man sent material in response to the request (Appendix AA10.2), which prompted a further request from the Danish Tax Agency on September 09, 2016 (Appendix AA10.3). The request was not responded to, but on September 22-23, 2016, Kamco and four other pension plans – including DW Construction – "sold" their TDC shares from August 2014 (Appendix AA1 (Revised), p. 5 along with **Appendix AA9.1-9.5**).

On October 11, 2016, the Danish Tax Agency sent the same letter, but to a new address (Appendix AA10.4). That letter was replied to by ED&F Man on November 11, 2016 (Appendix AA10.5).

The close timely connection between the inquiry by the Danish Tax Agency regarding TDC shares for 2015 and ED&F Man's construction of sales documents for the TDC shares from 2014 is quite conspicuous.

Moreover, with regard to the construction of the sale documents for the TDC shares from 2014, see also the submission in section 5.2.2, the Tax Agency's investigations show that it was not only Kamco, but also four additional pension plans represented by the Law Firm Lundgrens, including, as noted, DW Construction, for which ED&F Man constructed sales documentation in September 2016 (Appendix AA1 (Revised), p. 5, along with Appendix AA9.1-9.5). This concerned the following five pension plans, all of which have appealed against the decisions to revoke the refund decisions, including for these TDC shares from 2014:

| SANSTs | Name |
|--------|------|
| 18-0005398 | DW Construction Inc. Retirement Plan |
| 18-0005426 | American Investment Group Of New York, L.P. Pension Plan (leading case) |
| 18-0005423 | Kamco Investments, Inc, Pension Plan |
| 18-0005414 | Kamco LP Profit Sharing Pension Plan (leading case) |
| 18-0005427 | Moira Associates LLC 401 (K) Plan |

The sale documentation was constructed by ED&F Man on September 22, 2016, borrowing 3.5 million TDC shares from ING Bank (Appendix AA1, p. 5, next-to-last entry). ED&F Man then traded 3.5 million, 3 x 3.4 million and 2,901,000 shares back and forth between two internal accounts (the red markings in Appendix AA1 (Revised), p. 5 and p. 12-13). The five internal trades occurred, according to the account statements, within a few minutes of each other (Appendix AA7 (Revised), in conjunction with **Appendix AA8**). The Danish Tax Agency has marked in Appendix AA1 (Revised), p. 5, which pension plans the respective transactions concern.

Subsequently, the five pension plans each have a sales note for their shareholding that matches one of the five internal sales (Appendix AA9.1-9.5).

This implies that if one of the pension plans is audited individually, it looks like ED&F Man had the required number of shares in its account (up to 3.5 million TDC shares) and there is evidence of the transaction (money transfer and movement of shares between accounts). It is only when all five are checked together that it becomes apparent that there is constructive evidence, with 3.5 million borrowed shares becoming the 'sale' of 15.6 million shares.

It is emphasized that ED&F Man has not acknowledged any errors regarding TDC shares in August 2014.

When examined together, these additional examinations support how the documentation from ED&F Man is generally without probative value, being produced for the occasion and not reflecting real transactions."

**Court hearing**

The representative of the Pension Plan maintained the plea in law and main arguments.

The representative states, among other things, that the Danish Tax Agency has justified its decision to revoke a previous decision on the refund of dividend tax with very general considerations, which according to general principles of administrative law, does not meet the requirements for a statement of reasons.

The representative has also stated that the case to be assessed is only the case of the revocation of the dividend payment, as there is no legal basis to assess the original case where the dividend payment was made.

The representative has also stated that the burden of proof to revoke the original decision rests with the Danish Tax Agency, which has not fulfilled this burden.

The representative has stated that, with regards to the errors admitted by ED&F Man in a number of share transactions, it must be assumed that the other share transactions carried out by ED&F Man are correct share transactions.

The Tax Agency, represented by the Advocate General, has stated that an assessment of the Danish Tax Agency's decision to revoke the refund of dividends requires an assessment of the original case concerning the payment of dividend distribution, since this is the only way of assessing whether the original decision was made on the wrong basis. Reference is made to UfR 2020.1923 H, which states that an incorrect decision must be revoked.

The Danish Tax Agency has stated that the errors committed by ED&F Man are significant and have not been explained in detail by ED&F Man. It cannot be inferred from the acknowledged errors that the other share transactions were correct.

**The Danish National Tax Tribunal's decision**

Section 69b(1) of the Withholding Tax Act states that if a person liable to tax under Section 2 or Section 2 of the Danish Corporate Tax Act, has received dividends, royalties or interest in respect of which withholding tax has been withheld under Sections 65 to 65d in excess of the final tax under a double taxation agreement, the amount shall be repaid within six months of the Customs and Tax Administration receiving the request for a refund.

The Double Taxation Agreement between the United States and Denmark states in Article 10(3)(c) that dividends from a company resident in Denmark are not taxable in Denmark if the beneficial owner is a pension fund, is a resident in the US, as referred to in Article 22(2)(e). It is a condition that such dividends are not derived from the carrying on of business by the pension fund or through an associated enterprise.

Article 22(2)(e) of the Double Taxation Agreement between the United States and Denmark states that a person who is a resident of a Contracting State shall be entitled to all the benefits of this Agreement only if that person is a legal person, whether exempt from taxation or not, organized under the laws of a Contracting State for the purpose of providing retirement or similar benefits under a defined benefit scheme to employed persons, including self-employed persons. It shall be a condition that more than 50% of the beneficiaries, members or participants of such person are natural persons resident in one of the Contracting States.

The refund of dividend tax is conditional on the Pension Plan having owned shares and the Pension Plan having received dividends on those shares, where dividend tax has been included in the payment of the dividends.

The Danish National Tax Tribunal considers that the Pension Plan is required to prove that these conditions are met and that, on this basis, the Pension Plan was entitled to a refund of dividend tax.

It should be noted here that in Danish civil law, including tax law, there is a principle of straightforward burden of proof. This means, among other things, that the person stating to have a claim must prove that the claim exists. It follows from the general rules on the burden of proof that the person who is closest to obtaining and securing the relevant evidence also bears the burden of proof.

The Danish National Tax Tribunal does not consider that this burden of proof has been met.

The Danish National Tax Tribunal has determined that the Pension Plan was not entitled to the dividend refund. In this regard, it is emphasized that there is no evidence that the Pension Plan had purchased and was the owner of the alleged shares in question or that they received dividends from the shares. The documentation provided in the form of emails to and from ED&F Man, transcripts from ED&F Man referred to as Account Equity, Account Transactions, and Account Statements regarding transactions in the purchase and sale of shares and the entering into of options and swaps does not demonstrate the Pension Plan's ownership of the shares. Nor do the SWIFT notifications provided, which according to the Pension Plan are proof that the purchase price of the shares was paid, meet the requirements for proof that shares were traded on behalf of the Pension Plan, since the Danish Tax Agency has shown that ED&F Man, by acquiring 800,000 shares in Chr. Hansen Holding A/S for DKK 0, has purely borrowed the shares. As a result of this it therefore cannot be assumed that ED&F Man 'traded' these shares on behalf of the Pension Plan. In this regard, there does not seem to be the necessary connection to the Pension Plan documenting that the share transactions etc. have passed through the Pension Plan's finances, and no documentation has been provided for the cash flows to and from the Pension Plan concerning share transactions from the custodian or other actors involved in the share transactions etc., nor has any documentation been provided for the Pension Plan's financing of share purchases. It should be noted that despite the Danish Tax Appeals Board's request for, among other things agreements between the Pension Plan and its trustee and agreements with ED&F Man, correspondence between the Pension Plan and ED&F Man and the agreement between the Pension Plan and ED&F Man on the purchase/sale of shares, etc., no material has been provided in this respect.

It is further noted that ED&F Man has admitted to having prepared erroneous Tax Vouchers for US pension plans. ED&F Man has thus admitted that DKK 8,613,000 of the total DKK 21,060,000 refunds that have been paid, relate to incorrect Tax Vouchers in respect of the Pension Plan. The Danish National Tax Tribunal therefore considers it questionable to rely on the material received from ED&F Man as evidence of the Pension Plan's purchase of the alleged shares.

The Danish National Tax Tribunal cannot agree with the Pension Plan's argument that only the present case of withdrawal of refund of dividend should be considered without an assessment of the original case of dividend tax refund.

The conditions for a decision to be null and void and thus to be annulled are that the decision in question suffers from a defect of law, that the defect is substantial and that there are no special circumstances militating against nullity. Legal defects include, among other things, defects relating to legal subsumption, i.e., the question whether the conditions for issuing the decision and the requirements for its content are met in the case in question. The reason for this may be that the authority was under a misapprehension of the facts when issuing the decision. Such legal defects are generally considered to be substantial in themselves and will typically lead to the decision being considered invalid. In this respect, the Court refers, among other things, to F0B2005.527.

As the appeal body, the Danish National Tax Tribunal must verify whether the conditions for the Danish Tax Agency's revocation/cancellation of the decisions previously made on the refund of dividend tax have been met. This review includes a necessary assessment of whether there was a basis for granting the refund of dividend tax in the first place. The Tax Court is of the opinion that the Pension Plan has not provided the Danish Tax Agency or the Danish National Tax Tribunal with the necessary underlying evidence to support that the conditions for refund of dividend tax have been met. Reference is made to the Danish National Tax Tribunal's decisions dated December 19, 2019 (published as SKM2019.650.LSR) and the decision dated January 13, 2020 (published as SKM2020.29.LSR).

Since the Pension Plan is not considered to have owned shares or received dividends as declared in the applications for the recovery of dividends, the Danish Tax Appeals Board considers that the Danish Tax Agency has paid the reimbursements on an incorrect basis, on the basis of the Pension Plan's applications. The Danish Tax Agency was therefore entitled to annul the original decisions to pay dividend refunds, noting that the Danish Tax Agency's use of the word "withdrawal" cannot lead to a different result.

As a result of this, the contested decision is therefore upheld.




[signature]
Susanne Dahl
Presiding Judge

Anette Duvald
Case Worker

**Indicative assessment**

The Danish Tax Appeals Board must give an opinion with regards to the extent to which they agree or disagree with the complaint.

The decision given here with have an impact on the extent to which the appellant can be reimbursed for the costs of advice given during the appeal procedure. The finding is indicative only. The request for reimbursement of costs must be sent to the Danish Tax Agency, which will make the final decision.

The Danish Tax Appeals Board states the following:

The board does not agree with the appeal as stated.

**The decision is sent to**

American Investment Group Of New York, L.P. Pension Plan, 75 Claremont Rd Suite 309,

The Law Firm LUNDGRENS ADVOKATPARTNERSELSKAB, Tuborg Boulevard 12, 2900 Hellerup

The Danish Tax Agency

The law firm Poul Schmith, Kammeradvokaten I/S, Vester Farimagsgade 23, 1606 Copenhagen V

Skatteankestyrelsen

Advokatfirmaet Poul Schmith, Kammeradvokaten I/S
Vester Farimagsgade 23
1606 København V
Danmark
Att: Steffen Sværke

**Kontakt**
Send post til
Skatteankestyrelsen her

Telefon          3376 0909

**Sagsbehandler**
Anette Duvald
Direkte telefon   33760921

Vores sagsnr.    18-0005426

Dit sagsnr.      4001154 SS/ISA

7. juli 2020

**Post fra Skatteankestyrelsen**

Du får hermed en kopi af et brev fra Skatteankestyrelsen.

Vi beder dig henvise til Skatteankestyrelsens sagsnummer, hvis du kontakter os om dette brev.

Med venlig hilsen

Skatteankestyrelsen

Cvr-nr. 10 24 28 94
www.skatteankestyrelsen.dk

1 / 1

Skatteankestyrelsen

American Investment Group Of New York, L.P. Pension Plan
75 Claremont Rd Suite 309, ¨
Bernardsville NJ 07294
USA

**Kontakt**

Send post til
Skatteankestyrelsen her

Telefon        3376 0909

**Sagsbehandler**
Anette Duvald
Direkte telefon  33760921

Vores sagsnr.   18-0005426

Dit sagsnr.

7. juli 2020

**Afgørelse**

Der er klaget over SKATs afgørelse af 4. maj 2018 for American Investment Group
Of New York, L.P. Pension Plan. Landsskatteretten har nu truffet afgørelse i sagen.
Afgørelsen vedlægges.

**Vejledning om sagsanlæg**

Afgørelsen kan indbringes for domstolene senest 3 måneder efter afgørelsens dato.
Reglerne om domstolsprøvelse fremgår af skatteforvaltningslovens §§ 48-49.

Sagen skal indbringes for den byret, hvor den skattepligtige har hjemting. Stævnin-
gen skal udtages mod Skatteministeriet, Nicolai Eigtveds Gade 28, 1402 København
K. Den nærmere vejledning om sagsanlæg fremgår af www.domstol.dk.

Med venlig hilsen

Lisbeth Larsen

# Afgørelse

## fra

# Landsskatteretten

### ., 7 JULI 2020

Sagsnr. 18-0005426

I afgørelsen har deltaget:     Susanne Dahl, Bodil Toftemann, Poul Erik Nielsen og Tine Roed

Klager:     American Investment Group of New York, L.P. Pension Plan

Klage over:     SKATs afgørelse af 4. maj 2018

SKAT har tilbagekaldt tidligere afgørelser om refusion af udbytteskatter.

Landsskatteretten stadfæster SKATs afgørelse.

**Møde mv.**
Der har været afholdt møde med repræsentanten for American Investment Group of New York, L.P. Pension Plan, der tillige har haft lejlighed til at udtale sig på et retsmøde.

**Faktiske oplysninger**
American Investment Group of New York, L.P. Pension Plan (Pensionsplanen), der er stiftet den 29. oktober 2002, er registreret som en pensionskasse i USA.

SKAT har i 2014 og 2015 efter anmodning fra Pensionsplanens agent, Goal Taxback Limited, udbetalt refusion af udbytteskat via Goal Taxback Limiteds bankkonto i NatWest Bank.

Goal Taxback Limited har på vegne af Pensionsplanen sendt følgende anmodninger til SKAT om at få refunderet indeholdt udbytteskat på i alt 21.060.000 kr. for følgende aktier:

| Aktie | Dato for an-modning | Antal i stk. | Ex-dato | Udbytte i alt i kr. | Refunderet udbytteskat i kr. |
|---|---|---|---|---|---|
| Coloplast A/S - B | 05.03.2014 | 500.000 | 06.12.2013 | 3.500.000 | 945.000 |
| TDC A/S | 26.03.2014 | 5.000.000 | 07.03.2014 | 11.000.000 | 2.970.000 |
| Danske Bank A/S | 04.04.2014 | 7.750.000 | 19.03.2014 | 15.500.000 | 4.185.000 |

| | | | | | |
|---|---|---|---|---|---|
| Novo Nordisk A/S B | 04.04.2014 | 3.500.000 | 21.03.2014 | 15.750.000 | 4.252.500 |
| A.P. Møller Mærsk A/S B | 16.04.2014 | 1.000 | 01.04.2014 | 1.400.000 | 378.000 |
| Tryg A/S | 16.04.2015 | 50.000 | 04.04.2014 | 1.350.000 | 364.500 |
| TDC A/S | 14.08.2014 | 3.400.000 | 08.08.2014 | 5.100.000 | 1.377.000 |
| Chr. Hansen Holding A/S | 03.12.2014 | 800.000 | 28.11-2014 | 3.016.000 | 814.320 |
| Coloplast A/S - B | 10.12.2014 | 1.500.000 | 05.12.2014 | 11.250.000 | 3.037.500 |
| Novozymes A/S B | 04.03.2015 | 750.000 | 26.02.2015 | 2.250.000 | 607.500 |
| A.P. Møller Mærsk A/S B | 08.04.2015 | 4.000 | 31.03.2015 | 7.884.000 | 2.128.680 |
| I alt | | | | 78.000.000 | 21.060.000 |

Anmodningerne var vedlagt følgende bilag:

1. Blanket 06.003 ENG – Claim to Relief from Danish Dividend Tax.
2. Tax Vouchers – udarbejdet af Pensionsplanens custodian ED&F Man Capital Markets Limited (ED&F Man).
   FORM 6166
3. from Internal Revenue Service (IRS) – Certificate of resident in USA (udstedt af de amerikanske skattemyndigheder).
4. Power of Attorney af 19. februar 2014 til Goal Taxback Limited underskrevet af trustee Stacey Kaminer.

Ad 1. I blanket 06.003 erklæres det, at Pensionsplanen er den retmæssige ejer af aktierne og er omfattet af dobbeltbeskatningsoverenskomsten mellem Danmark og USA.

Ad 2. Ifølge Tax Vouchers udarbejdet af custodian ED&F Man har Pensionsplanen modtaget nettoudbytte af aktierne.

Med udgangspunkt i at Pensionsplanen skal eje aktierne på tidspunktet for generalforsamlingen (dagen før ex-datoen), er anskaffelsessummen for Pensionsplanens køb af de aktier, som fremgår af anmodningen, beregnet på baggrund af lukkekursen på sidste børsdag før ex-datoen:

| Aktie | Kursdato | Antal i stk. | Kurs | Beregnet anskaffelsessum i kr. |
|---|---|---|---|---|
| Coloplast A/S - B | 05.12.2013 | 500.000 | 358,30 | 179.150.000 |
| TDC A/S | 06.03.2014 | 5.000.000 | 52,65 | 263.250.000 |
| Danske Bank A/S | 18.03.2014 | 7.750.000 | 145,70 | 1.129.175.500 |
| Novo Nordisk A/S B | 20.03.2014 | 3.500.000 | 245,80 | 860.300.000 |
| A.P. Møller Mærsk A/S B | 31.03.2014 | 1.000 | 65.000,00 | 65.000.000 |
| Tryg A/S | 03.04.2014 | 50.000 | 551,50 | 27.575.000 |
| TDC A/S | 07.08.2014 | 3.400.000 | 51,35 | 174.590.000 |
| Chr. Hansen Holding A/S | 27.11.2014 | 800.000 | 258,90 | 207.120.000 |
| Coloplast A7S - B | 04.12.2014 | 1.500.000 | 527,00 | 790.500.000 |
| Novozymes A/S B | 25.02.2015 | 750.000 | 322,50 | 241.875.000 |
| A.P. Møller Mærsk A/S B | 30.03.2015 | 4.000 | 16.410,00 | 65.640.000 |

Alle aktier i danske børsnoterede selskaber er registreret hos VP Securities, som er den danske vær-dipapircentral.

Til denne registrering hører et værdipapirdepot i en dansk bank oprettet i en aktionærs navn. Et vær-dipapirdepot indeholder aktionærens aktiebeholdninger, som kan være sammensat af aktier i for-skellige danske børsnoterede selskaber. Et værdipapirdepot og dets beholdning kan også have flere ejere (benævnt et omnibusdepot).

Ved søgning i oplysninger fra VP Securities er der ikke fundet noget værdipapirdepot i en dansk bank, hvor Pensionsplanen er registreret som ejer.

SKAT har via kompetent myndighed i Danmark og USA modtaget oplysninger fra IRS i USA.

IRS har i brev af 3. august 2016 oplyst:

- At IRS har modtaget oplysninger fra Pensionsplanen ved FORM 5500-EZ for 2013 og FORM 5500 SF (Short Form) for 2014
- At IRS har oplyst, at Pensionsplanen ikke har indsendt FORM 5500 for 2015
- Det fremgår af oplysningerne fra de modtagne blanketter, at Pensionsplanens formue ultimo og antal deltagere i 2012, 2013 og 2014 udgør:

| Kalenderår | Aktiver/formue i USD ifølge FORM 5500-EZ/SF | DKK kurs ultimo året | DKK beregnet | Antal aktive deltagere |
|---|---|---|---|---|
| 2012 | 4.529.723 | 5,6591 | 25.634.155 | 1 |
| 2013 | 4.893.956 | 5,4127 | 26.489.516 | 1 |
| 2014 | 5.309.103 | 6,1214 | 32.499.143 | 1 |

IRS har i forbindelse med generelle spørgsmål om pensionsplaner og indskud herpå fremsendt links til IRS' hjemmeside vedrørende "Topics for Retirement Plans". Af hjemmesiden fremgår bl.a. andet føl-gende:

- At en One-Participant 401(k) plan dækker en virksomhedsejer uden nogen ansatte ud over per-sonen og dennes nærtstående personer.
- At det årlige indskud er begrænset til mellem 12.500 og 53.000 USD alt efter indskyders alder (over eller under 50 år).

IRS har til SKAT, Kompetent Myndighed, generelt oplyst:

- At hvis en pensionsplan ikke indgiver FORM 5500, tilkendegiver pensionsplanen, at der er tale om en "One-Participant (owners and Their Spouses) Retirement Plan".
- At hvis en skattefri pensionsplan driver virksomhed (Unrelated Business Income) skal den betale skat af indtægterne herfra, og der skal indgives en Form 990-T til IRS.
- At hvis en skattefri pensionsplan har lånefinansieret indkomst (Dept-finances Income) skal der betales skat af indtægterne heraf, og der skal indgives en Form 990-T til IRS.
- At hvis en pensionsplan udlodder midler, skal dette indberettes til IRS på en Form 1099, hvor det skal oplyses, hvor meget der er udbetalt og til hvem. Den person, der har modtaget mid-lerne, er skattepligtig af indtægten og skal selvangive denne.